J-S49027-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A.W., MOTHER | : | |
| | : | No. 712 MDA 2018 |

Appeal from the Decree Entered March 28, 2018
In the Court of Common Pleas of Berks County
Orphans' Court at No: 85072

| | | |
|---|---|---|
| IN THE INTEREST OF: X.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A.W., MOTHER | : | |
| | : | No. 713 MDA 2018 |

Appeal from the Decree March 28, 2018
In the Court of Common Pleas of Berks County
Orphans' Court at No: 85071

BEFORE:   SHOGAN, J., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY STABILE, J.:               **FILED NOVEMBER 15, 2018**

J.A.W. ("Mother") appeals from the March 28, 2018 decrees involuntarily terminating her parental rights to her sons, M.A.S., born in

_____
* Former Justice specially assigned to the Superior Court.

January 2016, and X.M.W., born in October 2013 (collectively, "Children").[1, 2] Upon review, we affirm the decree involuntarily terminating Mother's parental rights to M.A.S. We vacate the decree involuntarily terminating Mother's parental rights to X.M.W. without prejudice and remand for proceedings consistent with this memorandum.

In its opinion pursuant to Pa.R.A.P. 1925(a), the orphans' court set forth the relevant factual and procedural history of this case, which the record evidence supports. As such, we adopt it herein. *See* Trial Court Opinion, 5/10/18, at 4-9.

By way of background, the Berks County Children and Youth Services ("CYS") became aware of Mother and X.M.W. in the summer of 2014, when X.M.W. was approximately eight months old, due to allegations involving Mother's substance abuse and mental health issues, domestic violence, a lack of stable housing and employment, and a lack of proper medical care for X.M.W. *Id.* at 4. Following approximately seven months of services provided

---

[1] The orphans' court voluntarily terminated the parental rights of M.A.S.'s putative father, J.D.S., by decree dated March 26, 2018. By decree the same date, the court involuntarily terminated the parental rights of any unknown father and any putative father of M.A.S. The orphans' court involuntarily terminated the parental rights of X.M.W.'s natural father, M.A.F., by decree dated March 28, 2018. Neither J.D.S., M.A.F., nor any putative nor unknown father of Children have filed an appeal from the respective decrees terminating their parental rights.

[2] Children's guardian *ad litem* ("GAL") filed a brief to this Court in support of the termination decrees.

to Mother, the court placed X.M.W. in CYS's custody on May 26, 2015. *Id.* at 5. The court adjudicated X.M.W. dependent on June 3, 2015. *Id.*

On August 27, 2015, Mother was incarcerated for violating her probation due to testing positive for methamphetamines. *Id.* at 6. Mother remained incarcerated until the birth of M.A.S. in January 2016. *Id.* The court adjudicated M.A.S. dependent on March 30, 2016. *Id.*

At the time of the subject proceedings, X.M.W. was four and one-half years old. He displayed aggressive behavior and was diagnosed with oppositional defiance disorder. *Id.* at 7. M.A.S. was two years old, and he was in a separate foster home. He suffered from significant developmental delays and medical problems, including failure to walk and difficulty with eating and swallowing. *Id.* at 8. M.A.S. appeared to be eleven or twelve months old rather than his chronological age of 26 months. *Id.*

Throughout the history of this case, Mother was required to comply with Family Service Plan ("FSP") objectives including participating in parenting education and in evaluations and recommended treatments regarding drug and alcohol, mental health, and domestic violence. N.T., 3/26/18, at 75. In addition, she was required to obtain stable and appropriate housing and employment. *Id.* at 76.

The orphans' court held a hearing on CYS's involuntary termination petition on March 26, 2018. CYS presented the testimony of Laura Fritts, Ph.D., who performed a psychological and bonding evaluation; Lisa Mohler,

the caseworker from Partners in Parenting, who supervised Mother's visits with Children; Joshua Fasig, X.M.W.'s behavior specialist from the Commonwealth Clinical Group; Andrea Karlunas, Mother's therapist from the Commonwealth Clinical Group; and Cheri Kipp, CYS caseworker. Further, CYS introduced 101 exhibits in total, which the court admitted into the record. Mother testified on her own behalf.

By decree dated March 28, 2018, the orphans' court involuntarily terminated Mother's parental rights to M.A.S. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b). By decree the same date, the court involuntarily terminated Mother's parental rights to X.M.W. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed notices of appeal and concise statements of errors complained of on appeal on April 24, 2018, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.

On appeal, Mother presents four issues, as follows:

A. Whether the [orphans'] court erred as a matter of law by terminating [Mother's] parental rights as to her child especially in light of the fact that the minor child is separated from his sibling and reunification is warranted to allow the siblings to be raised together?

B. Whether the [orphans'] court erred in and abused its discretion in terminating [Mother's] parental rights where [Mother] has remediated the issues that led to the placement of the child?

C. Whether the [orphans'] court erred as a matter of law in terminating [Mother's] parental rights based on the length of time the child has been in care where there were compelling reasons not to terminate her rights especially in light of the

steps taken to remediate to the issues that led to the initial placement?

D. Whether the [orphans'] court erred as a matter of law in considering the lack of a bond between [Mother] and child where [CYS] did not meet their burden in establishing grounds for an involuntary termination?

Mother's brief at 4.

Before addressing the merits of this appeal, we must determine whether Children had the benefit of counsel during the involuntary termination proceeding as required by Section 2313(a) of the Adoption Act.[3] **See In re Adoption of T.M.L.M.**, 184 A.3d 585, 588 (Pa. Super. 2018) ("This Court must raise the failure to appoint statutorily-required counsel for children *sua sponte*, as children are unable to raise the issue on their own behalf due to their minority.") (citing **In re K.J.H.**, 180 A.3d 411, 414 (Pa. Super. 2017)).

In **In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017), our Supreme Court held that, pursuant to Section 2313(a), a child involved in a contested involuntary termination of parental rights proceeding must be appointed

---

[3] Section 2313(a) provides:

**(a) Child.--**The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

counsel. The term "counsel" refers to an attorney representing the child's legal interests, which the **L.B.M.** Court defined as the child's preferred outcome of the termination proceeding, as opposed to the child's best interests, "which the trial court must determine." **Id.** at 174. Significantly, the **L.B.M.** lead opinion did not gain a majority of the justices for the proposition that an attorney appointed as GAL during the underlying dependency proceedings is prohibited from also serving as counsel under Section 2313(a).

Our Supreme Court subsequently held in **In re T.S.**, 192 A.3d 1080 (Pa. 2018), that the trial court did not err in allowing the children's GAL to act as their sole representative during the termination proceeding because, at two and three years old, they were incapable of expressing their preferred outcome. The Court explained, "if the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings." **Id.** at 1092-93.

In this case, by order dated May 23, 2017, the orphans' court appointed Melissa Krishock, Esquire, as Children's GAL, who represented their best interests during the involuntary termination proceeding. The court did not

appoint legal-interests counsel for them. The younger child, M.A.S., was two years old, or 26 months, at the time of the proceeding. Pursuant to *T.S.*, *supra*, we conclude that his preferred outcome was not ascertainable because of his young age, and, therefore, there was no conflict between his legal and best interests. As such, the orphans' court did not violate the Section 2313(a) mandate to appoint counsel to represent M.A.S.

The older child, X.M.W., was nearly four and one-half years old at the time of the termination hearing. There is no indication in the record that he was incapable of expressing his feelings about permanency. However, nothing in the record reveals X.M.W.'s feelings and/or whether he had a preferred outcome of the termination proceeding. Although the testimony of Dr. Fritts, Ms. Mohler, and Mr. Fasig reveals that no parent-child bond exists between X.M.W. and Mother, to conclude on this evidence alone that there is no conflict between his legal and best interests would be speculation.

In addition, there is no indication in the certified record, or in Attorney Krishock's brief to this Court, that she met with or interviewed X.M.W. in an attempt to ascertain his feelings with respect to permanency, and if he had a preferred outcome and was capable of directing her representation at least to some extent. *See In re Adoption of D.M.C.*, ____ A.3d ____, ____, 2018 PA Super LEXIS 774 at *12 (Pa. Super. filed July 9, 2018) (concluding, in part, that the four-and-one-half-year-old child "may not have been old enough to actively participate in [his attorney's] representation of him, and it is possible

[the child] was too young to clearly express his position[.]" However, the child "likely had feelings about permanency," and his attorney "should have attempted to ascertain those feelings to determine whether [the child] had a preferred outcome and was capable of directing [his attorney's] representation at least to some extent.") (noting that Pa.R.P.C. 1.14 addresses representation of clients with diminished capacity)).

Accordingly, we are constrained to vacate the decree involuntarily terminating Mother's parental rights to X.M.W. without prejudice and remand for the orphans' court to appoint legal-interests counsel for X.M.W. pursuant to Section 2313(a). Such counsel must interview X.M.W. directly in an attempt to ascertain (1) his feelings about permanency; (2) whether he has a preferred outcome as to Mother; and (3) whether he is capable of directing counsel's representation at least to some extent. **See D.M.C.**, **supra** (vacating order involuntarily terminating the mother's parental rights without prejudice and remanding due, in part, to the children's attorney failing to attempt to ascertain their preferred outcome).

Once X.M.W.'s feelings and preferred outcome of the termination proceeding is identified, his counsel shall notify the orphans' court whether termination of Mother's parental rights is consistent with X.M.W.'s legal interests. If the court determines that there is no conflict between X.M.W.'s legal and best interests, then it may re-enter the original decree. However, if the court determines that X.M.W.'s legal interest is different from his best

interest, then the court shall conduct a new involuntary termination hearing with respect to Mother's parental rights to X.M.W.

Turning to the decree involuntarily terminating Mother's parental rights to M.A.S., we review it according to an abuse of discretion standard. We have explained:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we conclude that the certified record supports the decree pursuant to Section 2511(a)(2) and (b), which provides as follows.[4]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[4] Based on this disposition, to the extent Mother argues that the trial court abused its discretion in terminating her parental rights pursuant to Section 2511(a)(1) and (5), we need not review those subsections.

23 Pa.C.S. § 2511(a)(2) and (b).

This Court has explained that the moving party must produce clear and convincing evidence under Section 2511(a)(2), as follows: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See In re A.L.D.** 797 A.2d 326, 340 (Pa. Super. 2002). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. **Id.** at 337.

With respect to Section 2511(b), this Court has stated that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." **Id.** (citation

omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Instantly, Mother contends that the orphans' court abused its discretion in involuntarily terminating her parental rights because she has remediated her employment and housing issues, she has maintained sobriety since her pregnancy with M.A.S., and she has never refused treatment or services. Regarding M.A.S.'s special needs, Mother acknowledges that, during supervised visits, she "was not as comfortable with feeding and things as the foster parents," but she contends, throughout the life of this case, she "was denied the opportunity to demonstrate her abilities to parent her children." Mother's brief at 10.

Ms. Mohler supervises Mother's visits with Children, which occur once per week for four hours. N.T., 3/26/18, at 50. Specifically, she testified that Mother spends one and one-half hours alone with each child during her total of four hours of visitation per week. Mother spends the final hour visiting with both of them. *Id.* at 50. Ms. Mohler testified that she provides hands-on parenting instruction during visits. *Id.* In addition, she testified that Mother attends M.A.S.'s physical therapy and doctor appointments. *Id.* at 48. With respect to M.A.S.'s physical and developmental needs, Ms. Mohler testified, if

"prompted to work on certain things, [Mother is] able to do that minimally, but . . . she was not able to carry that into the next visit." *Id.* at 43. She explained:

> Q. Are there specific therapies and specific behaviors that [M]other is supposed to display with [M.A.S.] to help address some of his delays?
>
> A. Correct.
>
> Q. And do you see [M]other doing that during the visitation?
>
> A. She will work on things very minimally. Like, for example, when he was learning to walk, she would have him just like to get up and walk across the room one time. But she can't incorporate it into . . . his play or into his whole visit.
>
> Another example is the physical therapist in October was talking about working on going up and down steps. And where the visit is, there's just a set of three steps. That would be very easy for him to work on that. But she felt he was too young to be doing that and only in the last month began having him crawl up the steps. . . .

*Id.* at 43-44. On cross-examination by the GAL, Ms. Mohler testified:

> Q. [D]uring that hour when it's just [Mother and M.A.S.] one-on-one, she is not incorporating the therapeutic exercises or activities that he needs?
>
> A. She will, but it's very minimal. Like less than ten minutes in that hour and a half.

*Id.* at 51.

Ms. Karlunas, Mother's therapist, began working with her in April 2015. Since June 2016, she has been working with her one hour per week. *Id.* at 64. She testified that Mother's emotional stability is concerning. Ms. Karlunas explained on direct examination, in part:

- 13 -

[Mother] continues to deny that she has any depression or anxiety symptomatology. However, she evasively did not address her depression and anxiety in the summer of 2017 and I inadvertently found out she was on Cymbalta.

We then began to address the symptoms as she has suffered from anxiety and depression in the past, and to date [Mother] continues to minimize or deny that her symptomatology is present or that it has any effects on her parenting.

It is a concern to me that throughout the course of this case, there has been poor judgment exercised or poor insight exercised which is evident by the following: [Mother] obtained a dog during this period. It came to my attention that [M.A.S.] was allergic to dogs. When I addressed this with [Mother], she answered me that she would have to be court[-]ordered to get rid of the dog.

*Id.* at 65-66.

Moreover, Ms. Karlunas testified that Mother has not "transferred, incorporated and demonstrated throughout the [supervised] visits" the parenting skills that she and the other providers have taught her. *Id.* at 67. Further, she testified:

[Mother] pervasively has tended to deny the veracity of the parenting reports, despite that we've had five different parenting supervisors on [the] case. She denies any concerns addressed by casework.[5] In fact, at one point she walked out of the meeting, stating that she did not have to tolerate this behavior from professionals, avoiding any type of engagement or any type of addressing of our concerns.

And she continues to blame her children's problems on the foster parents. Specifically, [M.A.S.] was not walking. When I would

---

[5] Ms. Karlunas testified that, when she discussed the supervised visitation reports indicating that Mother was not incorporating parenting skills into the visits, Mother stated to her, "they're all lies." N.T., 3/26/18, at 70.

address that with [Mother], [she] stated that it was the foster parents' fault because they carried him too much. . . .

*Id.* On direct examination, Ms. Karlunas testified with respect to whether Mother has remedied any of the foregoing concerns, as follows:

At present, it is my professional opinion she's not remediated those particular concerns that I have outlined. She has remediated, she's obtained employment, she has managed to get promoted at her job.[6] She should be commended for that. . . . She has maintained sobriety for two years as far as we know, and she has demonstrated a level of engagement with the therapeutic process. However, those factors do not outweigh my concerns at this time.

*Id.* at 68.

Ms. Kipp, the CYS caseworker, agreed that Mother's parenting skills have not improved. She testified, "Despite [Mother's] strengths and making some improvement, numerous hours have been given to [Mother] with parenting education, casework[,] and therapeutic services, and she has shown a lack of progress and inconsistency in providing her parenting, appropriate parenting, and being able to meet the developmental, emotional, mental, social and physical needs of both children." *Id.* at 77.

We conclude that the foregoing testimonial evidence supports the decree involuntarily terminating Mother's parental rights to M.A.S. pursuant to Section 2511(a)(2). Mother's repeated and continued incapacity to develop

---

[6] Mother testified that she has been employed at a grocery store for over two years, and she was recently promoted to assistant manager in the meat department. *Id.* at 83.

- 15 -

necessary parental skills during M.A.S.'s entire life has caused him to be without essential parental care, control, or subsistence necessary for his physical and developmental needs. Further, the causes of Mother's incapacity cannot or will not be remedied insofar as her therapist testified that she refuses to acknowledge and take responsibility for not implementing parental skills during supervised visits.

We now review the decree pursuant to Section 2511(b), and do so mindful of the following settled case law.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.
>
> *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Upon careful review, there is no evidence that a parent-child bond exists between Mother and M.A.W. Therefore, it was reasonable for the orphans' court to conclude that none exists. *See In re K.Z.S.*, *supra*. The CYS caseworker, Ms. Kipp, testified that Children are thriving in their separate foster homes and "exhibit such a connection and strong bond to their foster parents." N.T., 3/26/18, at 78. Further, Dr. Fritts testified that there would be no detriment to Children if Mother's parental rights are terminated. *Id.* at 34. We conclude that the totality of the record evidence supports the involuntary termination of Mother's parental rights pursuant to Section 2511(b) in that it will serve M.A.S.'s developmental, physical, and emotional needs and welfare. Accordingly, we affirm the decree involuntarily terminating Mother's parental rights to M.A.S.

Decree involuntarily terminating Mother's parental rights to M.A.S. affirmed. Decree involuntarily terminating Mother's parental rights to X.M.W. vacated without prejudice to permit the orphans' court to re-enter the original decree if a new involuntary termination hearing is not required. Case remanded for proceedings consistent with this memorandum.[7]

Jurisdiction relinquished.

---

[7] Counsel Melissa Krishock's October 23, 2018 application to withdraw is denied.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/15/2018